**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 10, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

TIMOTHY JOHN KENNEDY,

      Plaintiff – Appellee,

v.

ERNEST ROGER PEELE,

      Defendant – Appellant,

and

MARK A. FINLEY; SHERIFF JOHN
WESLEY ANDERSON; EL PASO
COUNTY SHERIFF'S OFFICE;
UNITED STATES OF AMERICA,

      Defendants.

No. 12-1337
(D.C. No. 1:11-CV-00967-REB-KMT)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **BRORBY**, and **O'BRIEN**, Circuit Judges.

---

     [*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

Ernest Peele appeals the district court's denial of his motion to dismiss. Exercising jurisdiction under 28 U.S.C. § 1291, we conclude that Peele is entitled to qualified immunity and accordingly reverse.

**I**

Because this appeal concerns the district court's disposition of a motion to dismiss, we take the following facts from the operative complaint unless otherwise noted. See Wilson v. Montano, 715 F.3d 847, 852 (10th Cir. 2013). In March 1991, Jennifer Carpenter and Steve Staskiewicz were murdered. El Paso County Sheriff's Deputy Mark Finley was assigned to investigate the crimes. Two individuals who had been charged with kidnapping and sexual assault of Carpenter were likely suspects for the murders. Finley learned during the course of the investigation that these individuals had solicited various parties to murder Carpenter and Staskiewicz to prevent Carpenter from testifying against them, and Finley was aware of two letters discussing this plot.

Nevertheless, Finley focused his investigation on Timothy Kennedy, who had been with the victims on the day of the murders and had pawned a .380 caliber handgun—the same type of weapon used to kill Carpenter and Staskiewicz—shortly after the murders occurred. Finley conducted an interview of Kennedy, which Kennedy claims was unconstitutional, and used the information he obtained to procure a warrant to search Kennedy's home and vehicle. Kennedy alleges that Finley's warrant affidavit contained false statements and material omissions. Law enforcement officers seized a .380 caliber handgun and ammunition from Kennedy's home.

Finley asked Peele, an agent with the Federal Bureau of Investigation ("FBI"), to conduct a comparative bullet-lead analysis ("CBLA") of the bullets used in the murders and those found in Kennedy's home. Peele provided Finley an initial report on October 20, 1992. That report states that the compositions of some crime scene bullets and some of the ammunition seized from Kennedy's home "are either analytically indistinguishable or they exhibit such close compositional associations as to be consistent with originating from the same source."[1] Although other bullets contained "compositional differences," the report notes that such differences "may be found among bullets within a single box of cartridges." According to the complaint, Peele and the FBI "knew, as early as 1991, that there was a question regarding the scientific reliability of the lead matching theory" and had "knowledge that the conclusions stated lacked statistical and scientific basis" but "[t]his doubt was not disclosed."

After obtaining this report, Finley recommended to the district attorney that Kennedy be charged with murder, but the district attorney declined to file charges. Following a hiatus from the El Paso County Sheriff's Office, Finley was re-assigned to the Carpenter/Staskiewicz case. On March 25, 1993, Peele "was contacted by telephone for a definitive statement regarding the analysis [he] performed." The complaint alleges that "Peele stated that the bullets which killed Carpenter and Staskiewicz came from the same box as those seized from Mr. Kennedy's house," that "[t]his statement made by

---

[1] The report was not included in Kennedy's complaint, but was submitted as an attachment to Peele's motion to dismiss.

-3-

Agent Peele was false," and that "[t]his materially false statement was utilized to obtain an arrest warrant and at Mr. Kennedy's preliminary hearing." This allegation is apparently drawn from the arrest warrant affidavit, which states that Peele was contacted on March 25, 1993 "for a definitive statement regarding the analysis performed." According to the affidavit, however, Peele merely stated that "these bullets would be consistent with coming from the same box."[2]

Kennedy was eventually charged with the murders of Carpenter and Staskiewicz. He was convicted of both murders and sentenced on August 8, 1997, to two consecutive life terms without the possibility of parole. The complaint alleges that Peele "falsely testified at trial that the bullets which killed Carpenter and Staskiewicz came from the same box of ammunition as those taken from Mr. Kennedy's house."

In April 2009, the El Paso County District Court granted Kennedy's motion for post-conviction relief, vacated his convictions, and ordered a new trial. This ruling was based on the prosecution's failure to produce during discovery letters implicating the two individuals charged with Carpenter's kidnapping and sexual assault, related ineffective assistance of counsel, and newly discovered evidence. The newly discovered evidence included the FBI's decision in September 2005 to stop using CBLA because of doubts about its reliability. The court concluded that Peele's opinion testimony was no longer supported by the FBI and that it had "contributed significantly to the prosecution

---

[2] As with Peele's report, the arrest warrant affidavit was not included in the complaint, but attached as an exhibit to Peele's motion to dismiss.

evidence."[3]

Kennedy then filed a complaint against Finley, Peele, and others involved in his criminal case. With respect to Peele, Kennedy asserts a claim under <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), for malicious prosecution. Peele moved to dismiss this claim, arguing that he is entitled to both absolute and qualified immunity and also asserting that a <u>Bivens</u> claim could not be recognized on the facts alleged. The district court concluded that Peele was entitled to absolute immunity from liability for his trial testimony, but denied both absolute and qualified immunity as to Peele's pretrial statements. It declined to reach Peele's <u>Bivens</u> argument based on inadequate briefing, thereby allowing the case to proceed. Peele timely sought an interlocutory appeal.

**II**

"Although an order denying a motion to dismiss based on qualified immunity is not a final judgment, this court has jurisdiction under 28 U.S.C. § 1291 to review the order to the extent that it turns on an issue of law." <u>Wilson</u>, 715 F.3d at 852 (quotation omitted). We review the denial of such a motion de novo. <u>Brown v. Montoya</u>, 662 F.3d 1152, 1162 (10th Cir. 2011).

As did the district court, we accept as true all well-pled factual allegations in the complaint. <u>Id.</u> "To survive a motion to dismiss, a complaint must contain sufficient

---

[3] The court's order is not included in the complaint but is attached to Peele's motion to dismiss.

factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation omitted). When a defense of qualified immunity is raised, the plaintiff must satisfy a two-prong test in order to avoid dismissal. A "plaintiff must allege sufficient facts that show—when taken as true—the defendant plausibly violated his constitutional rights, which were clearly established at the time of violation." Schwartz v. Booker, 702 F.3d 573, 579 (10th Cir. 2012). Courts may address these prongs—plausible violation and clearly established law—in either order. Camreta v. Greene, 131 S. Ct. 2020, 2032 (2011).

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 614 (1999) (quotation omitted). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (quotation omitted). Clearly established law should not be defined "at a high level of generality." Id. at 2084. "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Id. at 2083.

The district court concluded that Peele was not entitled to qualified immunity because the complaint alleges that he "knowingly fabricated evidence." It ruled that the

-6-

prohibition against such conduct was clearly established in light of this court's ruling in Pierce v. Gilchrist, 359 F.3d 1279 (10th Cir. 2004), and that "the differences between that case and this one are matters of degree, not kind." Kennedy relies heavily on Pierce in his appellate briefing.

In that case, we considered a § 1983 claim for malicious prosecution brought by Jeffrey Pierce, who had been wrongly convicted of rape and other crimes. Id. at 1281, 1285. Pierce alleged that Joyce Gilchrist, a forensic chemist, "fabricated inculpatory evidence and disregarded exculpatory evidence, which led prosecutors to indict and prosecute [him] for the rape." Id. at 1281. Specifically, Gilchrist "identified a total of 33 scalp and pubic hair samples from the crime scene as 'microscopically consistent' with evidence taken from Mr. Pierce's body." Id. at 1282. Pierce alleged that Gilchrist:

> (i) concealed the fact that Mr. Pierce's hair did not match the hairs found at the crime scene, (ii) violated the district court's order to deliver the hair samples in a timely manner for review by Mr. Pierce's forensic expert, and (iii) disregarded her own findings that Mr. Pierce's blood contained a particular enzyme, PGM-2-1, which conclusively precluded Mr. Pierce from being the source of the sperm found on the victim.

Id. A report released by the FBI after Pierce had been convicted "concluded that none of the hairs taken from Plaintiff's body exhibited the same microscopic characteristics as those found at the crime scene." Id. at 1283. And a subsequent DNA analysis exonerated Pierce. Id.

We affirmed the district court's denial of qualified immunity. Id. at 1300. Our court had previously held that the prohibitions against "including false information in the

affidavit supporting the arrest warrant" and "omit[ting] from an arrest affidavit information which, if included, would have vitiated probable cause" were clearly established. Id. at 1299 (quotation omitted). Although Gilchrist's misconduct occurred after Pierce had been arrested, we concluded that "[t]here is no moral, constitutional, common law, or common sense difference between providing phony evidence in support of an arrest and providing phony evidence in support of continued confinement and prosecution." Id. "Gilchrist engaged in a deliberate attempt to ensure the prosecution and conviction of an innocent man." Id. at 1300. This conduct, we held, "violated Mr. Pierce's constitutional rights with obvious clarity." Id. (quotation omitted).

Although there are some similarities between the case at bar and Pierce, we must disagree with the district court's statement that the differences are merely matters of degree. In Pierce, the defendant allegedly lied about the results of the analyses she performed. See id. at 1291 ("Gilchrist falsely reported that the hairs were consistent; had she truthfully reported that they were not consistent, Mr. Pierce would have been released within hours of his arrest, and never tried."). That is, Gilchrist

> informed the police and prosecutorial authorities that hair analysis supported Pierce's involvement in the rape—even though in fact, far from implicating him in the rape, the hair analysis tended to exonerate him—and disregarded findings that Mr. Pierce's blood contained an enzyme that exonerated him of being the source of the sperm found on the rape victim.

Id. at 1293-94.

In sharp contrast, Kennedy does not allege that the CBLA performed by Peele actually showed that the bullets in his apartment were inconsistent with those found at the

-8-

crime scene.  Nor does Kennedy claim that Peele failed to disclose forensic test results that would have exonerated him.  Kennedy's complaint instead focuses on the reliability of CBLA in general.  It alleges that Peele knew "there was a question regarding the scientific reliability of the lead matching theory," but failed to disclose that the CBLA method "lacked statistical and scientific basis."

The complaint also alleges that Peele informed investigators "that the bullets which killed Carpenter and Staskiewicz came from the same box as those seized from Mr. Kennedy's house" and that this "materially false statement was utilized to obtain an arrest warrant and at Mr. Kennedy's preliminary hearing."  We do not read this allegation as suggesting that Peele lied about the results of the CBLA he performed in the sense that the test actually demonstrated the bullets did not match.  Instead, Kennedy is again alleging that Peele reported the CBLA results with a greater degree of confidence than was properly warranted.

Further, according to the arrest warrant affidavit, Peele did not claim that the bullets came from the same box, but that "these bullets would be consistent with coming from the same box."  (Emphasis added).  The district court declined to consider this discrepancy, stating that "a motion to dismiss under Rule 12(b)(6) is not the proper vehicle to consider such factual disputes."  However, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor

Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); see also Utah Gospel Mission v. Salt Lake City Corp., 425 F.3d 1249, 1253-54 (10th Cir. 2005) ("[A] document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute."). And "factual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true." GFF Corp. v. Associated Wholesale Grocers, 130 F.3d 1381, 1385 (10th Cir. 1997). The "same box" statement contained in the complaint was plainly not used "to obtain an arrest warrant" because such a statement does not appear in the arrest warrant affidavit.[4] Accordingly, the district court erred in rejecting Peele's reliance on the affidavit given that Kennedy did not dispute its authenticity and it was both central to the claim and referenced in the complaint. See Utah Gospel Mission, 425 F.3d at 1253-54.[5]

Properly construed, the complaint does not include well-pled, factual allegations that Peele "fabricated" evidence as we used that term in Pierce. 359 F.3d at 1281. In that case, the defendant told investigators that a forensic test indicated a match between two

---

[4] The complaint also alleges that this statement was used "at Mr. Kennedy's preliminary hearing." As previously noted, however, the district court concluded that Peele was entitled to absolute immunity for his testimony, and that ruling is not at issue in this appeal.

[5] Although we generally must accept a district court's version of the facts in reviewing the denial of qualified immunity at the summary judgment phase, this rule does not apply to our review of the denial of a motion to dismiss. Lewis v. Tripp, 604 F.3d 1221, 1226 (10th Cir. 2010) (citing Iqbal, 556 U.S. at 674).

-10-

samples, even though the forensic test actually showed the two samples did not match. See id. at 1291, 1293-94. Kennedy does not allege that the CBLA conducted by Peele showed that the bullets from the crime scene and the bullets found in Kennedy's apartment had differing compositions. Rather, Kennedy faults Peele for failing to disclose any statistical doubts about the CBLA technique.

This is a material and qualitative difference. Any reasonable officer would know that lying about the results of a forensic test is improper. See Pierce, 359 F.3d at 1300. But Kennedy does not direct us to any decisions holding that a forensic analyst must inform law enforcement of the precise error rate or confidence interval of tests performed during the pre-arrest phase of an investigation. There may be some forensic methods that are so unreliable as to be wholly improper, but we cannot ignore the fact that CBLA was widely accepted at the time of the events at issue. See United States v. Higgs, 663 F.3d 726, 738 (4th Cir. 2011) ("CBLA evidence was widely admitted into evidence in various courts in this country . . . up until at least 2003 . . . ."), cert. denied, 133 S. Ct. 787 (2012); United States v. Davis, 103 F.3d 660, 673-74 (8th Cir. 1996) (affirming admission of bullet comparison testimony at trial under Fed. R. Evid. 702); see also McBeth v. Himes, 598 F.3d 708, 716 (10th Cir. 2010) (to overcome qualified immunity, plaintiff must show that the right at issue "was clearly established at the time of the defendant's conduct").

We agree with Peele that the well-pled factual allegations of Kennedy's complaint attack CBLA in general rather than any specific conduct by Peele. We further agree that the reliability of a forensic method, unlike the actual result of a forensic test, is "precisely

-11-

the kind of evidence that the adversary system is designed to test." United States v. Berry, 624 F.3d 1031, 1040 (9th Cir. 2010). To overcome Peele's assertion of qualified immunity, Kennedy must make a plausible showing that Peele violated clearly established constitutional rights. Schwartz, 702 F.3d at 579. This he has failed to do. The prohibition against fabricating evidence is clearly established, see Pierce, 359 F.3d at 1298, but the complaint and judicially noticeable documents fail to develop a plausible claim of fabrication as we described it in Pierce. Alternatively, Kennedy seems to suggest that Peele's use of the CBLA technique in the 1990's violated clearly established law. Given the widespread judicial acceptance of testimony relying on CBLA during the relevant time period, we reject this claim as well.

### III

For the foregoing reasons, the district court's denial of qualified immunity to Peele is **REVERSED**. We **REMAND** with instructions to dismiss the claims against Peele.[6]

Entered for the Court

Carlos F. Lucero
Circuit Judge

---

[6] We express no opinion on Peele's alternative arguments as to the viability of a Bivens claim, the existence of probable cause, and absolute immunity.