# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-10228

United States Court of Appeals
Fifth Circuit

**FILED**

September 25, 2015

Lyle W. Cayce
Clerk

RANDY COLE; KAREN COLE; RYAN COLE,

Plaintiffs-Appellees

v.

CARL CARSON,

Defendant-Appellant

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

No. 15-10045

RANDY COLE; KAREN COLE; RYAN COLE,

Plaintiffs-Appellees

v.

MICHAEL HUNTER; MARTIN CASSIDY,

Defendants-Appellants

Appeals from the United States District Court
for the Northern District of Texas

No. 14-10228 c/w No. 15-10045

Before HIGGINBOTHAM, CLEMENT, and HIGGINSON, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Seventeen-year-old Ryan Cole was severely injured in an armed encounter with police. Ryan and his parents, Karen and Randy Cole ("the Coles"), brought suit against Officers Michael Hunter and Martin Cassidy, alleging that they violated Ryan's Fourth Amendment right not to be subjected to excessive force. They also sued Officer Carl Carson, alleging Carson violated Ryan's rights under the Fourth and Fourteenth Amendments by lying and concealing evidence in order to protect Hunter and Cassidy; that he caused Ryan to be wrongfully charged with aggravated assault of a public servant. The district court denied Carson's motion to dismiss and Hunter and Cassidy's motion for summary judgment, rejecting the officers' immunity defense at the motion stage of the case.

We dismiss defendants' appeal of the district court's order refusing to grant summary judgment on the excessive force claim, and we affirm the district court's refusal to dismiss the due process claim relating to fabrication of evidence. However, we conclude that the district court erred in allowing all other claims to proceed.

I

Seventeen-year-old Ryan Cole was a junior at Sachse High School.[1] Ryan suffered from obsessive-compulsive disorder. The night before the shooting, he quarreled with his parents, and later took guns and ammunition from their gun safe. He visited his friend Eric Reed Jr. late that night

---

[1] One of the cases before us comes from a denial of summary judgment, and one from a denial of a motion to dismiss. They involve distinct standards of review and universes of relevant facts. For purposes of this summary, we describe the facts in broad strokes, turning to their detail as we address specific issues.

2

carrying weapons. The next morning, October 25, 2010, Ryan visited Eric again carrying two handguns: a revolver and a Springfield 9mm semi-automatic. At around 10:45 in the morning Ryan allowed Eric to take the revolver, and used Eric's cellphone to ask his grandparents to pick him up at a nearby CVS.

During the course of the morning, police were informed that Ryan was carrying at least one gun and acting aggressively, and they began looking for him. After Ryan left Eric's house with his remaining handgun, he was seen by several officers and ordered to stop. He continued to walk away from the officers and placed the gun against his own head. He walked towards a set of train tracks separated by a narrow wooded area and grassy strip from Highway 78, a major road. The CVS where he was to meet his grandparents was located on the other side of the wooded area, across Highway 78.

Three police officers—Hunter, Cassidy, and Carson—were attempting to locate Ryan on the other side of the wooded area, near Highway 78 and the CVS. Ryan crossed the wooded area and backed out of the woods near Officer Hunter, who was some distance from Officers Cassidy and Carson. The officers believed Ryan was unaware of them when he backed out, and remained quiet so as not to alert him. Then Ryan made some turning motion to his left. The officers say that he turned to face Officer Hunter and pointed his gun at him, while the Coles argue that he merely began to turn toward the CVS, still with his gun pointed at his own head. Whether any warning was given is disputed, but Officers Hunter and Cassidy opened fire, hitting Ryan twice. In addition, Ryan's gun discharged, hitting his own head, and leaving stippling—gunpowder residue around the wound due to the gun being fired from less than thirty inches away.

No. 14-10228 c/w No. 15-10045

Ryan fell, and the officers ceased firing. He was picked up by an ambulance and taken for treatment of his severe injuries. Over time, Ryan has made a significant recovery, but lives with profound disabilities. He has incurred extensive medical bills and continues to require care. After the shooting, the three officers had an opportunity to confer before making their statements to police investigators—statements which conveyed that Ryan was given a warning and that he pointed his gun at Officer Hunter prior to being shot. The Coles argue that these statements are lies contradicted by recordings and physical evidence.

The officers' statements resulted in Ryan being charged with aggravated assault on a public servant—a felony. As a result of the assault charge, Ryan was placed under house arrest. The assault charge was dismissed by the District Attorney on May 8, 2012, and Ryan received deferred adjudication for an unlawful carrying charge. The Coles incurred substantial legal fees in order to confront the aggravated assault charge, which they allege was concocted by the officers to justify the shooting.

II

The Coles brought suit in the Eastern District of Texas. The appellant officers[2] moved to transfer; answered, asserting absolute and qualified immunity defenses; and moved to dismiss or alternatively for the court to order a reply to their immunity defenses under Federal Rule of Civil Procedure 7(a).[3] After transfer to the Northern District of Texas, the district court ordered the Coles to notify it whether they would file additional

---

[2] Along with other defendants.

[3] A procedure for employing Rule 7(a) to require a reply when a qualified immunity defense is pleaded with specificity was described in *Schultea v. Wood*, 47 F.3d 1427 (5th Cir. 1995).

4

documents in the form of a Rule 7(a) Reply or an amended Complaint.

The Coles filed their First Amended Complaint which, as relevant here, includes § 1983 claims against Officers Cassidy and Hunter for excessive force and against all three officers for manufacturing and concealing evidence in order to get Ryan falsely charged with assault. The defendants moved to dismiss, with the appellant officers asserting absolute and qualified immunity defenses. The court then issued a Memorandum Opinion and Order denying the Motion to Dismiss with respect to the § 1983 claims based on both excessive force and conspiracy to conceal and manufacture evidence to bring a false charge. Officer Carson appealed that order with regard to the latter claim; Officers Cassidy and Hunter did not. The district court stayed the false charge claim as to Cassidy and Hunter pending the result of Carson's appeal. We heard argument on that appeal.

Meanwhile, the district court allowed limited discovery focused on Officers Cassidy and Hunter's qualified immunity defense to the excessive force charge. Those two officers then moved for summary judgment on that charge, which the district court denied. Officers Cassidy and Hunter appealed, and we consolidated their appeal with Carson's.

III

Following the chronology of the underlying events, we turn first to the excessive force claim. The district court denied Officers Cassidy and Hunter's motion for summary judgment, finding they were not entitled to qualified immunity because, under the plaintiffs' evidence, their use of force violated clearly established law.

*a. Qualified immunity inquiry at summary judgment*

The officers are protected "from liability for civil damages" by qualified immunity "insofar as their conduct does not violate clearly established

No. 14-10228 c/w No. 15-10045

statutory or constitutional rights of which a reasonable person would have known."[4] Qualified immunity is an immunity from suit and thus should be resolved as early as possible.[5] At summary judgment, it is the plaintiff's burden to rebut a claim of qualified immunity once the defendant has properly raised it in good faith.[6]

"District court orders denying summary judgment on the basis of qualified immunity are immediately appealable . . . when based on a conclusion of law."[7] We may not review the district court's determination that a genuine fact dispute exists,[8] but we are called to determine whether, resolving all fact disputes in the plaintiffs' favor, the defendants are nonetheless entitled to qualified immunity as a matter of law.[9] Within the limited scope of our inquiry, review is de novo.[10] We must:

> engage in a two-pronged inquiry. The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a [federal] right . . . ." The second prong . . . asks whether the right in question was "clearly established" at the time of the violation.[11]

We may address either prong first.[12]

### b. Fourth Amendment violation

---

[4] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).

[5] *Id.* at 231-32.

[6] *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992).

[7] *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 531 (5th Cir. 1997).

[8] *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010).

[9] *Id.* at 397-98; *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000).

[10] *Good*, 601 F.3d at 398.

[11] *Tolan v. Cotton*, 134 S. Ct. 1861, 1865-66 (2014) (citations omitted); *see also Trent v. Wade*, 776 F.3d 368, 384 (5th Cir. 2015) (rejecting idea that the second prong should be further subdivided to ask whether the defendants' actions were "objectively reasonable").

[12] *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (citing *Pearson*, 555 U.S. at 236).

To show a violation of the Fourth Amendment's prohibition against excessive force, the Coles must prove that "the force used was objectively unreasonable."[13] In assessing the reasonableness of the force, we examine:

> the facts and circumstances of the particular case—the need for force determines how much force is constitutionally permissible. The court should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[14]

In deadly force cases, "the severity and immediacy of the threat of harm to officers or others are paramount to the reasonableness analysis."[15] Additionally, we bear in mind both that "[t]he intrusiveness of a seizure by means of deadly force is unmatched,"[16] and that the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[17]

Accepting the Coles' best version of the evidence, as they must, Officers Cassidy and Hunter argue that shooting Ryan was not objectively unreasonable—that he presented an immediate threat of serious harm when they fired.[18] Accordingly, we recount the version of events most favorable to the Coles.

---

[13] *Luna v. Mullenix*, 773 F.3d 712, 719 (5th Cir. 2014) (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)). The officers do not dispute that the Coles have produced evidence of "(1) an injury; (2) which resulted directly from a use of force that was clearly excessive to the need." *Luna*, 773 F.3d at 719.

[14] *Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013) (footnotes omitted).

[15] *Luna*, 773 F.3d at 719-20.

[16] *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

[17] *Graham v. Connor*, 490 U.S. 386, 396-97 (1989) ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

[18] Both the officers and the Coles focus on the reasonableness of the shooting as a whole, without any serious attempt to separate the analysis as to each officer.

Just before the shooting, Officer Hunter was in an exposed position between Highway 78 and the narrow wooded area separating it from the train tracks. He was looking for Ryan, expecting him to be nearby because of his own observations and a radio report that Ryan was on the railroad tracks near his position. Officer Cassidy was also between Highway 78 and the wooded area with Officer Carson, but was some distance away. Officer Hunter heard rustling in the woods near him, and signaled to the other officers that Ryan was there. Ryan then backed out of the woods with his gun to his own head, and his back to Officer Hunter. Both Officers Cassidy and Hunter believed Ryan was initially unaware of their presence, and stayed quiet so that he would not become aware of them. Ryan turned somewhat to his left, possibly in order to approach the CVS where his grandparents were waiting, and the officers opened fire without warning. Ryan turned further around as the officers continued firing, and his own gun, still pointed at his head and with his finger on the trigger, discharged involuntarily as a result of his being shot.

At the time they fired, the officers were aware that Ryan had been walking around the neighborhood holding a gun to his head, and that he had not surrendered to other officers who came in contact with him. Ryan looked like a teenager, and Officer Cassidy was aware that he had recently broken up with his girlfriend, a student at Sachse High. Officer Hunter believed Ryan might be suicidal or might simply be using the threat to himself to evade officers. Both officers were aware that Ryan had brought guns to Eric Reed Jr.'s house, and Officer Cassidy knew that there had been a disturbance at the Cole house the night before. The officers were aware that Ryan had told Eric not to try to take his remaining gun, and that he did not "wanna use it on" him. This was the only threatening or aggressive action or speech

8

Officer Hunter was aware of Ryan making. The officers knew that they were firing in the vicinity of a busy road, across from shops and other populated buildings. They knew there were schools within walking distance, and that measures were taken to secure them and to protect Ryan's ex-girlfriend.

First, the relevant principles. It is clear that the "use of deadly force, absent a sufficiently substantial and immediate threat, violate[s] the Fourth Amendment."[19] The threat must be "immediate";[20] we consider the totality of the circumstances,[21] including relevant information known to the officers.

The fact that a person has a gun and is behaving in a dangerous manner does not necessarily constitute an immediate and serious threat justifying use of deadly force. In unpublished but persuasive decisions, we have denied qualified immunity where a person, though undisputedly holding a gun to his own head, was complying with officers' orders,[22] and where a person, reportedly armed and a suspect in a double-homicide, had ceased running and had his arms at his sides.[23] When we have found officers justified for shooting suicidal people who were armed with guns, we have

---

[19] *Luna*, 773 F.3d at 725. Our focus is not upon actual risk, but upon the question of whether the officer could have "reasonably believe[d] that the suspect pose[d] a threat of serious harm to the officer or to others.'" *Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (quoting *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011)).

[20] *Luna*, 773 F.3d at 725; *Harris*, 745 F.3d at 772; *Sanchez v. Fraley*, 376 F. App'x 449, 453 & n.1 (5th Cir. 2010) (unpublished) ("[I]t was clearly established well before [2007] that 'deadly force violates the Fourth Amendment *unless* "the officer has probable cause to believe that the suspect poses a threat of serious physical harm"' . . . [which] must be 'immediate.'" (citations omitted) (quoting *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 488 (5th Cir. 2001), and *Tennessee v. Garner*, 471 U.S. 1, 11 (1985))); *Reyes v. Bridgwater*, 362 F. App'x 403, 407-09 (5th Cir. 2010); *Reese v. Anderson*, 926 F.2d 494, 500 (5th Cir. 1991).

[21] *See Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008); *Reese*, 926 F.2d at 500.

[22] *Graves v. Zachary*, 277 F. App'x 344, 349 (5th Cir. 2008) (finding fact dispute over whether the victim was complying with officer's orders at the time he was shot to be material, notwithstanding the fact that he was holding a gun to his own head); *id.* at 348 ("Merely having a gun in one's hand does not mean *per se* that one is dangerous.").

[23] *Sanchez*, 376 F. App'x at 451-52.

depended on the victim's *additional* threatening "*Manis*"[24] acts and disobedience of police commands, which elevated the immediacy and severity of the danger.[25]

Our caselaw persuasively has held that the fact that a suicidal person who has a gun to his head, hence poses some deadly risk to officers and others, does not always justify shooting him.[26] Just as there is no "open season on suspects fleeing in motor vehicles,"[27] despite the inherent risks of such flight,[28] there is no open season on suspects with guns.[29] Instead, "the real inquiry is whether the fleeing suspect posed such a threat that the use of deadly force was justifiable."[30] "[T]he threat must be sufficiently imminent at the moment of the shooting to justify deadly force."[31]

We conclude that the facts that Ryan was holding a gun to his head, that the officers believed he had made some threat to use it against a peer, and that the officers knew Ryan was attempting to evade officers, could not

---

[24] See discussion below at notes 34-40.

[25] *See, e.g.*, *Royal v. Spragins*, 575 F. App'x 300, 301, 303-04 (5th Cir. 2014) (emphasizing that suicidal victim ignored warning to drop his gun and pointed it at the officers); *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1134-35 (5th Cir. 2014) (emphasizing that the suicidal victim fired gun, ignored warnings to put it down, and moved towards officers with it); *Ramirez*, 542 F.3d at 127, 131 (emphasizing that suicidal victim with gun ignored officer's commands, got out of his car, and "brought his hands together in front of his waist" "as if to grip the handgun with both hands in preparation to aim it at the officers"); *see also City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1770, 1775 (2015) (addressing shooting of woman with knife who threatened officers and, despite warnings and then pepper spray, "kept coming at the officers until she was 'only a few feet from a cornered Officer Holder.' At this point, the use of potentially deadly force was justified.").

[26] *See, e.g.*, *Graves*, 277 F. App'x at 349.

[27] *Lytle v. Bexar Cty.*, 560 F.3d 404, 414-15 (5th Cir. 2009).

[28] *Id.* at 415 ("Nearly any suspect fleeing in a motor vehicle poses some threat of harm to the public.").

[29] *See Graves*, 277 F. App'x at 348 ("Merely having a gun in one's hand does not mean *per se* that one is dangerous.").

[30] *Id.*

[31] *Luna*, 773 F.3d at 723.

No. 14-10228 c/w No. 15-10045

in the circumstances here justify the use of deadly force.[32] Though Ryan was approaching a busier area from which several witnesses observed the shooting, he was shot in a relatively open area with only the officers immediately present.[33] He was on foot and walking, not running, and he did not know Officers Hunter, Cassidy, and Carson were there.

Indeed, the officers do not argue that they were justified in shooting Ryan by the above circumstances alone. Instead, they focus on the fact that Ryan, whose back was initially towards Officer Hunter, turned to his left immediately before they shot. They argue that if they had waited, Ryan could have continued turning until he was facing Officer Hunter, and shot him before they could react. According to the officers, if Ryan had been allowed to turn around and face Officer Hunter without being fired on, he would have "posed an immediate deadly threat."

The officers invoke cases in which we have found that a use of deadly force was justified expressly because the person, ignoring police warnings, made some threatening motion towards officers, or moved in a way reasonably interpretable as drawing an immediately dangerous weapon.[34]

---

[32] The facts here contrast instructively with those in *Ballard v. Burton*, where we found that shooting was justified even if the suicidal victim did not point his gun directly at law enforcement officers just before he was shot because "during the course of the night's events [he] refused to put down his rifle, discharged the rifle into the air several times while near officers, and pointed it in the general direction of law enforcement officers." 444 F.3d 391, 402-03 (5th Cir. 2006).

[33] Indeed, only Officer Hunter was reported by the officers as being in immediate danger. Of course, officers may use deadly force to protect their own lives, but the relative openness and lack of immediate bystanders or chaotic conditions informs our understanding of the circumstances.

[34] *See, e.g.*, *Rice*, 770 F.3d at 1134-35 (finding no constitutional violation where police warned and then shot a suicidal man who "was undisputedly approaching the officers with a loaded weapon which he had recently fired and which he refused to surrender"); *Clayton v. Columbia Cas. Co.*, 547 F. App'x 645, 653 (5th Cir. 2013) (qualified immunity appropriate where "suspect with dangerous and violent propensities" "continued toward the Deputy,

11

The act justifying deadly force is sometimes called a *Manis* act.[35] We have found qualified immunity was inappropriate due to the absence of a *Manis* act, even when the victim had or was believed to have a gun.[36]

Turning to one's left is not a threatening *Manis* act in these circumstances, particularly when the person does not even know the officers are there.[37] It is distinctly unlike raising a gun at officers or moving a gun up to waist-level and gripping as if preparing to fire.[38] The officers make much of our statement in *Rice* that "the material fact" was that the victim was "armed and moving toward the officers."[39] But moving purposefully towards an officer who is ordering the person to stop, with a drawn and recently fired gun,[40] is much more threatening than having a gun to one's own head, and turning without knowledge of the officer's presence.

---

ignoring his commands"); *Elizondo v. Green*, 671 F.3d 506, 510-11 (5th Cir. 2012) (finding it was not clearly unreasonable to shoot a person who "ignored repeated instructions to put down the knife he was holding" and "was hostile, armed with a knife, in close proximity to [the officer], and moving closer"); *Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009) (finding no constitutional violation where victim ignored repeated police commands, "reached under the seat of his vehicle and then moved as if he had obtained the object he sought"); *id.* (collecting cases); *Ramirez*, 542 F.3d at 131 ("The totality of Ramirez's conduct could reasonably be interpreted as defiant and threatening. He repeatedly refused the officers' commands and ultimately stood, armed, several yards from the officers. Ramirez brought his hands together in what we believe could reasonably be interpreted as a threatening gesture, as if to grip the handgun with both hands in preparation to aim it at the officers.").

[35] *See Manis*, 585 F.3d at 844.

[36] *See Sanchez*, 376 F. App'x at 451-52 (finding qualified immunity inappropriate in absence of *Manis* act where victim, who was a suspect in a double homicide and was reported to have a gun and to have "forcibly attempted to enter somebody's house," had ceased running and had his hands at his sides when shot); *Graves*, 277 F. App'x at 346 ("It is not disputed that [the victim] never verbally threatened [the officers], never pointed his gun at the officers, and did not even move aggressively.").

[37] Recall that the officers themselves believed Ryan was not aware of their presence.

[38] See cases cited in note 34.

[39] *Rice*, 770 F.3d at 1135.

[40] *Id.* at 1134-35.

In sum, if the Coles' version of the evidence is believed, it was not objectively reasonable to use deadly force against Ryan Cole when the teenager emerged on foot from the wooded area with a gun to his own head and turned to his left.

### c. Clearly established law

Under the second prong of the qualified immunity analysis, we ask whether it was clearly established in October 2010 that using deadly force against a person in circumstances like those here was objectively unreasonable:[41]

> A right is clearly established only if "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." A case directly on point is not required; rather, "[t]he central concept is that of 'fair warning': The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."[42]

In 2009, we held that "[i]t has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others."[43] In *Luna v. Mullenix* we extended that holding, finding that by March 2010, it was clearly established that shooting at a fleeing car whose driver had threatened to shoot pursuing

---

[41] *See Saucier v. Katz,* 533 U.S. 194, 200 (2001).

[42] *Trent*, 776 F.3d at 383 (citations to *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014), and *Kinney v. Weaver,* 367 F.3d 337, 350 (5th Cir. 2004) (en banc), removed); *see also Sheehan*, 135 S. Ct. at 1776 ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures.").

[43] *Lytle*, 560 F.3d at 417.

police officers was objectively unreasonable.[44] We also held that it was clearly established by March 2010 that the threat in question had to be "sufficiently substantial and immediate."[45]

If anything, the foot pursuit of Ryan Cole presented a less severe and immediate threat than the chase in *Luna*. First, walking away on foot is less inherently dangerous than fleeing in a car. Second, though in Ryan's case officers could see that he was pointing a gun at his own head, he never threatened officers with it; in *Luna*, the victim not only claimed to have a gun in the fleeing car, but explicitly threatened to shoot police officers.[46] In *Luna*, we emphasized that the shooting officer decided to shoot the car before it came into view—that he was not forced to make a "split-second judgment."[47] In this case, though the officers may not have decided to shoot ahead of time, they were expecting to encounter exactly what they found: Ryan walking with a gun to his head.

By October 2010, we had also repeatedly analyzed the sufficiency of *Manis* acts to justify deadly force when the underlying circumstances might not otherwise justify it.[48] In short, by October 2010, reasonable officers were on notice that they could not lawfully use deadly force to stop a fleeing person who did not pose a severe and immediate risk to the officers or others, and they had many examples of the sorts of threatening actions which could

---

[44] 773 F.3d at 725.

[45] *Id.*

[46] *Id.* at 722. It turned out that he did not actually have a gun.

[47] *Id.* at 723-24.

[48] *See, e.g., Sanchez*, 376 F. App'x at 451-52; *Reyes*, 362 F. App'x at 407; *Manis*, 585 F.3d at 844 (collecting cases); *Graves*, 277 F. App'x at 346; *Ramirez*, 542 F.3d at 127, 131; *Mace v. City of Palestine*, 333 F.3d 621, 624-25 (5th Cir. 2003).

14

justify deadly force.[49] Turning left while unaware of an officer's presence is not among them.

Under the Coles' version of the facts, it was objectively unreasonable under clearly established law to shoot Ryan. As a result, the fact disputes identified by the district court—including the central issue of whether Ryan pointed his gun at Officer Hunter—are material, and we dismiss the appeal for lack of jurisdiction.

## IV

We now turn to the claim that Officer Carson lied and concealed evidence in order to protect Officers Hunter and Cassidy after the shooting. The district court refused to dismiss the Coles' claim that Officer Carson agreed and acted with others "to deprive Ryan Cole of various constitutional rights including, but not limited to, his right to remain free from malicious prosecution, wrongful conviction, and unlawful confinement." The court located the source of the rights in the "Fourth and Fourteenth Amendment[s]." Officer Carson appeals, asserting qualified and absolute immunity defenses as he did below.

---

[49] The out-of-circuit cases cited by the officers do not lead to a different conclusion. They involve situations where the victim had been warned repeatedly yet moved a gun "very quickly" and pointed it at officers shortly before being shot, *see Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1311 (10th Cir. 2009); where it was difficult for officers to see, and the victim ignored commands at the scene of the shooting and instead escalated matters by raising a gun to his head, *see Garczynski v. Bradshaw*, 573 F.3d 1158, 1162-63, (11th Cir. 2009); where the victim fired a gun in a chaotic, crowded environment and then ignored an officer's orders to stop, *see Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997); and where the victim ignored the shooting officers' commands and moved either his gun hand or his other hand in the vicinity of his gun just prior to being shot, *see Thurman v. Hawkins*, CIV. 13-50-GFVT 2014, WL 4384387, at *1, 4 (E.D. Ky. Sept. 3, 2014). These cases are distinguishable from the facts before us, and in any event do not undermine this circuit's clearly established law.

The denial of a motion to dismiss based on qualified immunity or a substantial claim of absolute immunity is immediately appealable to the extent it turns on legal questions.[50] We review *de novo*,[51] accepting "all well-pleaded facts as true and draw[ing] all reasonable inferences in favor of the nonmoving party."[52] To avoid dismissal based on qualified immunity, the Coles had to allege (1) "a violation of a constitutional right" which (2) was "'clearly established' at the time of [Carson's] alleged misconduct."[53] The Coles had the burden of pleading "specific conduct and actions giving rise to a constitutional violation" to meet the defense.[54]

### a. Allegations that Officer Carson fabricated evidence

The Coles pled the following relevant facts in their First Amended Complaint (FAC) and the expert affidavits they attached to it.[55] First, Ryan was seen by several officers walking in public openly carrying a handgun, and at least one witness called police to report that he had a gun. The FAC alleges that when Ryan emerged from the wooded area, he was facing away from Officer Hunter, with the gun held to his own head. Without warning Ryan or identifying themselves, Officers Hunter and Cassidy opened fire. After the shooting, Officers Carson, Cassidy, and Hunter were "permitted to leave the scene for a considerable period of time without any supervision,"

---

[50] *Mitchell v. Forsyth*, 472 U.S. 511, 525, 530 (1985); *Hous. Cmty. Hosp. v. Blue Cross & Blue Shield of Tex., Inc.*, 481 F.3d 265, 268-69 & n.11 (5th Cir. 2007).

[51] *Morgan*, 659 F.3d at 370 (qualified immunity); *Orellana v. Kyle*, 65 F.3d 29, 33 (5th Cir. 1995) (absolute immunity).

[52] *Morgan*, 659 F.3d at 370 (footnote omitted).

[53] *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Hernandez v. United States*, 785 F.3d 117, 120 (5th Cir. 2015) (en banc).

[54] *Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996).

[55] Neither party argues that the facts alleged in the expert affidavits, which were attached to the FAC expressly to provide greater detail to meet the officers' immunity defenses, are not properly considered. *See Davoodi v. Austin Indep. Sch. Dist.*, 755 F.3d 307, 310 (5th Cir. 2014); *Wilson v. Birnberg*, 569 F. App'x 343, 344 n.1 (5th Cir. 2014).

giving them opportunity to confer. The Coles allege that the officers "formed and carried out an agreement . . . to hide and cover up . . . the true events" in order to justify the use of force and avoid consequences for killing Ryan, who they believed was likely to die. Their alleged aim was to "prosecute and arrest Ryan Cole for . . . an offense that each of them knew he did not commit."

The Coles allege that Officer Carson made false statements to investigators that Ryan aimed his gun at Officer Hunter and that Hunter warned him before shooting. The Coles allege that physical evidence, recordings, and expert opinions show these statements cannot be true. They allege that the false statements led "Garland police officers [to] file[] a case with the District Attorney's office in Dallas County charging Ryan Cole with the felony offense of aggravated assault on a public servant." Ryan was subsequently indicted by a grand jury for that offense, based again on the officers' statements. "As a result of the fictitious charges . . . Ryan Cole was confined indefinitely under house arrest." We are also told that "[o]n or about May 8, 2012, the Dallas County District Attorney's office dismissed" the assault charge. "At or near the same time," Ryan "pleaded no contest" and "received deferred adjudication for the charge of unlawfully carrying a weapon." The Coles incurred substantial legal fees in order to confront the aggravated assault charge.

We address the alleged constitutional violations in turn.

b. *Fourth Amendment violation*

17

Pretrial use of fabricated evidence to secure a person's arrest can violate the Fourth Amendment.[56] However, we have said that in order to make out a Fourth Amendment claim under either a "false arrest" or "illegal detention" theory, the relevant actors must not be aware of facts constituting probable cause to arrest or detain the person for *any* crime.[57] The Supreme Court has made it clear that this is the law as far as warrantless arrests are concerned.[58]

There is some suggestion that the standard may be different when a magistrate is deceived in order to obtain a warrant.[59] In such a case, the focus may not be on what facts officers were aware of, but on whether, once the false information is excised, the information *presented to the magistrate* could justify the arrest.[60] We need not decide the precise contours of these

---

[56] *Castellano v. Fragozo*, 352 F.3d 939, 959 (5th Cir. 2003) (en banc) (noting that, in contrast to misconduct occurring at trial, Castellano's "arrest and pretrial detention" could support a Fourth Amendment claim).

[57] *Whittington v. Maxwell*, 455 F. App'x 450, 458-59 (5th Cir. 2011) (stating that "[w]ith regard to pretrial confinement, '[t]he sole issue [under the Fourth Amendment] is whether there is probable cause for detaining the arrested person pending further proceedings,'" and finding illegal detention claim could stand where there was a factual dispute over the existence of probable cause); *O'Dwyer v. Nelson*, 310 F. App'x 741, 745 (5th Cir. 2009) ("'[T]o prevail in a § 1983 claim for false arrest,' . . . [a]s applied to the qualified immunity inquiry, the plaintiff must show that the officers could not have reasonably believed that they had probable cause to arrest the plaintiff for any crime." (citations omitted)).

[58] *Devenpeck v. Alford*, 543 U.S. 146, 153-54 (2004).

[59] *See Hamilton v. Collett*, 83 F. App'x 634, 637 (5th Cir. 2003) ("[T]he question is whether the allegedly false testimony was necessary to the Magistrate Judge's determination of probable case."); *see also Baldwin v. Placer Cty.*, 418 F.3d 966, 970 (9th Cir. 2005) (in search warrant case, finding that true information outside affidavit tainted by lies could not be used to sustain warrant).

[60] *See Hamilton*, 83 F. App'x at 637. An arrest may be valid under the Fourth Amendment though the warrant was not if there was probable cause for a warrantless arrest. *See Behrens v. Sharp*, 15 F.3d 180, 1994 WL 24936, at *3-4 (5th Cir. 1994). We have said that the Fourth Amendment is not implicated by an arrest by an officer with probable cause, even when the offense is a misdemeanor occurring outside the officer's presence. *Fields v. City of S. Houston*, 922 F.2d 1183, 1189 (5th Cir. 1991). However, this analysis

issues now, however, because the Coles' First Amended Complaint fails to set out "specific conduct and actions" concerning Ryan's seizure which can survive qualified immunity.

In Texas, unlawful carrying consists of "intentionally, knowingly, or recklessly carr[ying] on or about [one's] person a handgun" or other weapon when one is not on his own property or inside of or directly en route to his motor vehicle.[61] Based on the Coles' pleadings, it appears that, during the entire period Ryan was under house arrest, there was known probable cause to arrest him for unlawful carrying of a weapon. Both the unlawful carry and aggravated assault charges were disposed of "at or near the same time," after which Ryan was apparently no longer subject to house arrest.

To the extent that the Coles seek to argue that the existence of known probable cause to arrest Ryan for unlawful carrying is not fatal to their Fourth Amendment claim, they have failed to allege specific conduct to meet Officer Carson's qualified immunity defense. We are told only that Ryan was placed under house arrest "[a]s a result of [the] fictitious charges."

Given that the face of the FAC reveals the known existence of probable cause to arrest for unlawful carrying, and given the Coles' failure to plead facts supporting a theory of Fourth Amendment violation despite that probable cause, the Coles have not pled a violation of clearly established law, and Officer Carson is entitled to qualified immunity. Put another way, the Coles have alleged that Ryan was placed under house arrest *with* probable cause. That is not a clearly established Fourth Amendment violation without

---

may be affected if Ryan was at home when he was placed under house arrest. *Harris v. Canulette*, 997 F.2d 881, 1993 WL 261085, at *2 n.8 (5th Cir. 1993) (limiting *Fields* to arrests outside the home).

[61] Tex. Penal Code Ann. § 46.02.

something more, and the Coles have not alleged what that something more might be.

### c. Brady *violation*

The Coles argue that Officer Carson also violated Ryan's Fourteenth Amendment due process rights, due both to a *Brady*[62] violation, and more generally to his role in the filing of false charges. The Coles allege that Officer Carson committed a *Brady* violation in two ways: by lying to conceal his own knowledge that Ryan Cole never assaulted an officer, and by conspiring with other officers to conceal physical evidence also tending to exculpate Ryan. But prior to 2010, we had held that *Brady* is not implicated when there is no trial.[63] Ryan Cole was not tried for aggravated assault, nor did he plead guilty; the charge was dismissed. There is no suggestion that the aggravated assault charge was used as leverage to secure a plea on the unlawful carrying charge. It follows that Officer Carson was not on notice that withholding evidence in these circumstances could violate *Brady*, and he is entitled to qualified immunity for the alleged *Brady* violations.

### d. Due process violation – fabrication of evidence

We turn now to the Coles' claim that Officer Carson violated Ryan's clearly established due process rights when he allegedly lied to investigators to secure a false charge of aggravated assault.

We begin by recognizing that there is no "substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal

---

[62] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment").

[63] *United States v. Santa Cruz*, 297 F. App'x 300, 301 (5th Cir. 2008); *see also Matthew v. Johnson*, 201 F.3d 353, 361-62 (5th Cir. 2000) (applying rule in *Teague v. Lane*, 489 U.S. 288 (1989), to bar *Brady* attack on state court conviction).

prosecution except upon probable cause."[64] That much is clear from the Supreme Court's fractured decision in *Albright v. Oliver*. In *Albright*, a plaintiff was wrongfully charged with selling a cocaine look-alike substance, a charge later dismissed.[65] The Court rejected his claim that the prosecution violated due process. We have held that *Albright*'s reach is limited; the case "did not speak to the Fourteenth Amendment beyond eschewing reliance upon substantive due process to create a requirement of probable cause to initiate a prosecution. . . ."[66] Moreover, "that portion of *Albright* that suggests that the Fourth Amendment applies to pretrial deprivations of liberty did not receive the support of a majority of the Justices."[67]

*Albright* also differs in two important ways from the case at hand. First, although the defendant detective in *Albright* accepted the story of an unreliable informant and may have given "misleading" testimony,[68] there was no suggestion that he deliberately fabricated evidence. In contrast, the Coles allege that Officer Carson deliberately lied in order to get Ryan charged to cover an unlawful use of force. Several of our sister circuits have found this distinction pivotal in determining whether a due process violation is committed by the fabrication of evidence.[69]

Second, a majority of the Justices in *Albright* depended upon the potential availability of a Fourth Amendment recourse the plaintiff had

---

[64] *Albright v. Oliver*, 510 U.S. 266, 268 (1994) (plurality).

[65] *Id.* at 268-69.

[66] *Castellano*, 352 F.3d at 948.

[67] *Brothers v. Klevenhagen*, 28 F.3d 452, 456 n.3 (5th Cir. 1994).

[68] *Albright*, 510 U.S. at 277 (opinion of Ginsburg, J.); *id.* at 292-93 (Stevens, J., dissenting).

[69] *See Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) (en banc) ("Although the Fourth Amendment covers seizures . . . law enforcement's intentional creation of damaging facts would not fall within its ambit."); *see also Kennedy v. Peele*, 552 F. App'x 787, 792-93 (10th Cir. 2014); *Drumgold v. Callahan*, 707 F.3d 28, 61-62 & n.27 (1st Cir. 2013).

rejected,[70] observing that Albright should have brought his claim under the Fourth Amendment.[71] In contrast, the Coles tried to make out a Fourth Amendment claim, but we have explained that it is unavailing due largely to the existence of probable cause on another count. Yet setting aside his time seized under house arrest, Ryan still was framed and charged with a felony, and subjected to attendant monetary and reputational injuries flowing from such a serious charge. Unlike Albright, who *chose* to invoke substantive due process rather than the Fourth Amendment, Ryan Cole has no other option.

1.

We built upon the uncertain foundation of *Albright* in our en banc decision in *Castellano v. Fragozo*.[72] *Castellano* held that the elements of a state malicious prosecution claim were neither sufficient nor independently necessary to state a claim under § 1983 where a state actor allegedly fabricated evidence to procure an arrest and conviction.[73] Rather, the particular constitutional violation alleged had to be identified with clarity:[74]

> [C]ausing charges to be filed without probable cause will not without more violate the Constitution. . . . It is equally apparent that additional government acts that may attend the initiation of a criminal charge could give rise to claims of constitutional deprivation.
>
> The initiation of criminal charges without probable cause

---

[70] *Albright*, 510 U.S. at 271 (plurality); *Id.* at 277 (opinion of Ginsburg, J.) (noting that "Albright deliberately subordinated invocation of the Fourth Amendment" as a "strategic decision); *id.* at 289 (opinion of Souter, J.).

[71] The Justices noted that all of Albright's injuries could likely have been remedied via such a challenge. *Id.* at 274 (plurality); *id.* at 276-77 (opinion of Ginsburg, J.); *id.* at 288-91 (opinion of Souter, J.) (noting "rule of reserving due process for otherwise homeless substantial claims").

[72] 352 F.3d 939.

[73] *Id.* at 953-54.

[74] *Id.* at 945.

> may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued.[75]

We ultimately found that a Fourth Amendment violation had been alleged with regard to Castellano's pretrial seizure, and a Fourteenth Amendment due process violation was pled with regard to the knowing use of fabricated evidence and perjury at trial.[76]

While the due process violation in *Castellano* was tied to the "right to a fair trial,"[77] we rejected the idea that "the specific constitutional rights guiding a criminal trial spend their force in assuring a fair trial."[78] Moreover, we later held in *Boyd v. Driver* that officials' perjured testimony and tampering with video evidence constituted a due process violation even where the plaintiff was acquitted.[79] Thus even when a trial functions properly to vindicate a person's innocence, the "manufacturing of evidence and knowing use of that evidence along with perjured testimony to obtain a wrongful conviction deprives a defendant of his long recognized right to a fair trial secured by the Due Process Clause."[80]

We returned once more to *Albright* and *Castellano* in *Cuadra v. Houston Independent School District*.[81] There we considered a claim against a school district for manipulating evidence which led to charges against the

---

[75] *Id.* at 953.

[76] *Id.* at 953-55, 960. Thus, as in *Albright*, *Castellano* did not address a situation where the Fourth Amendment provided no recourse.

[77] *Id.* at 942, 957-58.

[78] *Id.* at 956.

[79] 579 F.3d 513, 514-15 (5th Cir. 2009); *see also Boyd v. Driver*, 495 F. App'x 518, 523 (5th Cir. 2012) (reiterating that the first *Boyd* case decided no conviction was necessary).

[80] *Boyd*, 579 F.3d at 515 (quoting *Castellano*, 352 F.3d at 942).

[81] 626 F.3d 808 (5th Cir. 2010).

plaintiff, and stated that the "claims are based on alleged pretrial deprivations of [plaintiff's] constitutional rights and, under the holding in *Albright*, such claims should be brought under the Fourth Amendment."[82] Citing *Cuadra*, we recently held in *Bosarge* that a person indicted and held for six months based on a mistaken identification had not stated a due process claim.[83] But neither *Cuadra* nor *Bosarge* involved deliberate fabrication of evidence to support false charges. *Cuadra* focused on a failure of certain school officials to turn over a key document;[84] and in *Bosarge*, we did not credit conclusory allegations that the misidentification was intentional.[85] Neither case answers the question of whether deliberate fabrication by law enforcement officers to justify a police shooting violates due process.

In sum, we have held that a victim of intentional fabrication of evidence by officials is denied due process when he is either convicted or acquitted. We have never decided whether false charges must survive to the trial stage in order to implicate due process rights.

2.

Our sister circuits have taken varying approaches to fabrication of evidence and "malicious prosecution" claims in the wake of *Albright*.[86] That said, they largely either have held that charges based on fabricated evidence support a due process claim, or have not yet answered the question. Two

---

[82] *Id.* at 814.

[83] *Bosarge v. Miss. Bureau of Narcotics*, 14–60242, 2015 WL 4282372, at *5 (5th Cir. July 15, 2015). *Bosarge* also cited *Castellano*, which we have discussed, and *Blackwell v. Barton*, which involved a mistaken identification rather than intentional fabrication, and only a brief detention—no charges were brought. 34 F.3d 298, 300-01 (5th Cir. 1994).

[84] *Cuadra*, 626 F.3d at 811, 813-14.

[85] *Bosarge*, 2015 WL 4282372, at *6.

[86] *See, e.g.*, *Castellano*, 352 F.3d at 949-53 (surveying the circuits' "approaches to malicious prosecution claims").

circuits have found that there is no due process claim in the absence of a conviction—a requirement we have not insisted upon.

The Ninth Circuit held in *Devereaux v. Abbey* that "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government,"[87] a formulation we quoted approvingly in *Good v. Curtis*.[88] In *Devereaux*, the plaintiff alleged that investigators charged him with rape and molestation on the basis of statements they should have known were false.[89] Though the charges were dropped in exchange for a guilty plea to two misdemeanors,[90] the Ninth Circuit reasoned that:

> Under *Pyle v. Kansas,* 317 U.S. 213, 216 (1942), the knowing use by the prosecution of perjured testimony in order to secure a criminal conviction violates the Constitution. While *Pyle* does not deal specifically with the bringing of criminal charges, as opposed to the securing of a conviction, we find that the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious, and *Pyle* is sufficiently analogous, that the right to be free from such charges is a constitutional right.[91]

In *Ricciuti v. N.Y.C. Transit Authority*, the police arrested a plaintiff with probable cause, but then allegedly fabricated a confession resulting in additional charges.[92] The Second Circuit denied qualified immunity for the fabrication despite the fact that the charges were dismissed without trial.[93] The court held that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he

---

[87] 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc).

[88] 601 F.3d at 398-99.

[89] 263 F.3d at 1073.

[90] *Id.*

[91] *Id.* at 1075 (citation shortened).

[92] 124 F.3d 123, 126-27, 129 (2d Cir. 1997).

[93] *Id.* at 129-30 (citing due process cases and principles).

violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."[94] The Second Circuit has since recognized that the fabrication in *Ricciuti* deprived the plaintiffs of liberty in part because it "caused [them] to be charged with a more serious crime."[95]

In *Pierce v. Gilchrist*, a plaintiff was arrested and convicted on the basis of falsified evidence created by an investigator.[96] Though not always distinguishing clearly between the plaintiff's Fourth and Fourteenth Amendment claims,[97] the Tenth Circuit upheld the district court's refusal to dismiss on qualified immunity grounds based on the use of false evidence to "induce prosecutors to initiate an unwarranted prosecution."[98] The court explained that it saw no "reason to distinguish between falsifying evidence to facilitate a wrongful arrest and engaging in the same conduct several days later to induce prosecutors to initiate an unwarranted prosecution."[99] Thus the fact that there was probable cause for the arrest was immaterial. In another "malicious prosecution" case ending in dismissal of criminal charges, the court explicitly rejected substantive and procedural due process claims[100]

---

[94] *Id.* at 130.

[95] *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012). The circuit reiterated its holding in a later case which ended with a not-guilty verdict after "28 court appearances," an apparent reference to the burdensomeness of defending against false charges. *Jocks v. Tavernier*, 316 F.3d 128, 133, 138 (2d Cir. 2003).

[96] 359 F.3d 1279, 1281-82, 1284 (10th Cir. 2004).

[97] *See id.* at 1296 & n.11.

[98] *Id.* at 1296.

[99] *Id.*

[100] *Becker v. Kroll*, 494 F.3d 904, 919-24 (10th Cir. 2007). The same month, the court considered, but rejected for other reasons, another Fourteenth Amendment claim where the charges ended in dismissal. *See generally Novitsky v. City Of Aurora*, 491 F.3d 1244 (10th Cir. 2007).

footed on a failure to hand over certain exculpatory evidence.[101]

More recently, the Tenth Circuit has clarified its stance. In *Klen v. City of Loveland*, the court reversed a grant of summary judgment against a claim that various defendants fabricated evidence "thus facilitating" prosecution of a plaintiff who eventually pleaded no-contest.[102] There the court noted that "[u]se of an indictment based on perjured testimony to bring charges, for example, itself represents a denial of due process" despite the lack of a trial;[103] the "use of a perjured affidavit to defeat a defendant's attempt to dismiss an indictment on grounds of selective prosecution" could also support a due process claim.[104]

The Eighth Circuit likewise found that a due process claim is stated where a police officer claimed that, though he was innocent of using excessive force against a victim, he was "set up," prosecuted (and acquitted), and administratively charged "for patently arbitrary reasons."[105] In *Moran v. Clarke*, the en banc court held that the substantive due process claim should not have been denied in a judgment as a matter of law because the officer presented evidence that he was *intentionally* set up, and there was damage to his professional reputation and evidence of improper consideration of his race.[106] Such actions could violate fundamental rights and "shock the conscience."[107] The Eighth Circuit has since found that a substantive due process violation survived summary judgment in the absence of a trial where

---

[101] *Becker*, 494 F.3d at 924. The Tenth Circuit has also emphasized the importance of *intentional* fabrications. *See Kennedy*, 552 F. App'x at 792-93.

[102] 661 F.3d 498, 515 (10th Cir. 2011).

[103] *Id.* at 516.

[104] *Id.*

[105] *Moran v. Clarke*, 296 F.3d 638, 648 (8th Cir. 2002) (en banc).

[106] *Id.* at 644-45, 647.

[107] *Id.*

false evidence was used to cause plaintiffs to plead guilty,[108] and in a case where the charges were dropped without a plea.[109]

The Second, Eighth, Ninth, and Tenth Circuits have thus all found denials of due process when charges rest on fabricated evidence. The Seventh Circuit's decisions appear to point the other way. The court has held that "a police officer does not violate an acquitted defendant's due process rights when he fabricates evidence."[110] Acquittal forecloses the claim.[111] In the Seventh Circuit's view, the only liberty interest damaged in such cases "stems from [plaintiff's] initial arrest"[112] and should be addressed under the Fourth Amendment;[113] being forced to defend oneself at trial is no deprivation of liberty.[114] The Seventh Circuit's no-due process violation decisions have occurred in cases that either did not address the availability of a Fourth Amendment claim[115] or found that the claim had been purposefully abandoned,[116] and it has suggested a willingness to consider deprivations short of conviction and imprisonment if properly raised.[117]

The remaining circuits do not appear to have answered the question before us. The First Circuit has held that police officers violate due process when they fabricate evidence in order to get someone falsely convicted[118] or immediately punished with segregation within a jail.[119] The circuit has

---

[108] *Winslow v. Smith*, 696 F.3d 716, 735 (8th Cir. 2012).

[109] *Livers v. Schenck*, 700 F.3d 340, 343-44, 354-55 (8th Cir. 2012).

[110] *Saunders-El v. Rohde*, 778 F.3d 556, 560-61 (7th Cir. 2015).

[111] *Id.* at 560-61.

[112] *Id.* at 561 (quoting *Alexander v. McKinney*, 692 F.3d 553, 557 (7th Cir. 2012)).

[113] *Alexander*, 692 F.3d at 557-58.

[114] *Saunders-El*, 778 F.3d at 561.

[115] *Id.* at 559-61.

[116] *See Alexander*, 692 F.3d at 556.

[117] *Serino v. Hensley*, 735 F.3d 588, 594-95 (7th Cir. 2013).

[118] *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004).

[119] *Surprenant v. Rivas*, 424 F.3d 5, 15 (1st Cir. 2005).

emphasized the importance of the specific intent to fabricate or use false evidence,[120] and explained in oft-quoted broad terms that:

> [S]ome truths are self-evident. This is one such: if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction).[121]

Clear enough, but the circuit does not appear to have explicitly addressed whether false charges in the absence of a conviction or immediate punishment state a denial of due process.

The Third Circuit considered a § 1983 claim that police fabricated evidence leading to charges and a wrongful conviction.[122] Though the court expressly did not answer "whether pre-trial detentions can implicate constitutional rights beyond the Fourth Amendment,"[123] it did state that "[w]hen falsified evidence is used as a basis to initiate the prosecution of a defendant, or is used to convict him, the defendant has been injured."[124] The Sixth Circuit "recognize[s] a . . . claim of malicious prosecution under the Fourth Amendment, which encompasses wrongful investigation, prosecution, conviction, and incarceration,"[125] but it remains unclear whether a

---

[120] *See Drumgold*, 707 F.3d at 61-62 & n.27.

[121] *Limone*, 372 F.3d at 44-45 (citation to *Devereaux*, 263 F.3d at 1074-75, omitted); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 296 (3d Cir. 2014) (quoting *Limone*); *Whitlock v. Brueggemann*, 682 F.3d 567, 581-82 (7th Cir. 2012) (same); *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) (same); *Washington v. Wilmore*, 407 F.3d 274, 285 (4th Cir. 2005) (same); *Atkins v. County of Riverside*, 151 F. App'x 501, 506 (9th Cir. 2005) (same).

[122] *Halsey*, 750 F.3d at 288-89.

[123] *Id.* at 293.

[124] *Id.* at 289.

[125] *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (citation omitted).

substantive due process claim might lie in some circumstances. In *Gregory v. City of Louisville*, the court held that "the subset of malicious prosecution claims which allege continued detention without probable cause must be . . . analyzed under the Fourth Amendment,"[126] but expressly reserved the question of whether "malicious prosecution" claims based on liberty deprivations distinct from pretrial detention might state due process violations.[127]

The D.C. Circuit does not appear to have addressed the issue of whether a due process claim could lie when police fabricate evidence, though it has noted its view that *Albright* "held that malicious prosecution does not violate 'substantive' due process rights."[128] The Eleventh Circuit has done likewise,[129] though noting the possibility that a procedural due process claim might lie.[130] The circuit recently recognized a due process claim where a plaintiff alleged that police officers shot, tasered, and beat him, and then fabricated a cover-up which resulted in two years of jail and an eventual acquittal on charges of aggravated assault on a law enforcement officer.[131]

3.

---

[126] 444 F.3d 725, 750 (6th Cir. 2006).

[127] *Id.* at 748 n.10. In a recent unpublished decision where plaintiffs alleged constitutional violations stemming from several search warrants and an indictment, the court held that the Fourth Amendment rather than substantive due process governed the claims "[t]o the extent that [they] involve a challenge to the warrant affidavit and the resulting searches, seizures, and prosecutions." *Meeks v. Larsen*, 14-1381, 2015 WL 2056346, at *9 (6th Cir. May 5, 2015). Besides being non-precedential, this was not a case of intentional fabrication of evidence, as the court did not credit conclusory allegations that the indictment or warrants were based on "false and misleading information." *Id.* at *4 (indictment); *id.* at *6-7 (warrants).

[128] *Pitt v. D.C.*, 491 F.3d 494, 512 (D.C. Cir. 2007).

[129] *Wood v. Kesler*, 323 F.3d 872, 881 n.14 (11th Cir. 2003).

[130] *U.S. Steel LLC, v. Tieco, Inc.*, 261 F.3d 1275, 1289 (11th Cir. 2001).

[131] *Weiland v. Palm Beach Cty. Sheriff's Off.*, 13-14396, 2015 WL 4098270, at *1-2, 9 (11th Cir. July 8, 2015).

All the circuits that have squarely considered the question have either found that a due process violation may lie where state officers fabricate evidence to support false charges against a plaintiff, or have found no due process violation in the absence of a conviction, an approach we have expressly rejected.[132]  We agree with those that have found a due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person.

Executive action must shock the conscience in order to violate substantive due process.[133] We have said that:

> Conduct sufficient to shock the conscience for substantive due process purposes has been described in several different ways. It has been described as conduct that 'violates the decencies of civilized conduct'; conduct that is 'so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency'; conduct that 'interferes with rights implicit in the concept of ordered liberty'; and conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'[134]

Deliberate framing of a person by the state offends the most strongly held values of our nation. We echo again the apt words of the First Circuit that, "if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals."[135] As the Third Circuit has stated, "no sensible concept of ordered liberty is consistent with law enforcement cooking

---

[132] *Boyd*, 579 F.3d at 514.

[133] *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 867 (5th Cir. 2012); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998); *id.* at 860-62 (Scalia, J., concurring).

[134] *Doe ex rel Magee*, 675 F.3d at 867 (quoting *Lewis*, 523 U.S. at 846-47 & n.8).

[135] *Limone*, 372 F.3d at 44-45.

up its own evidence."[136] Here, the framing was allegedly done in order to conceal and justify excessive force against one of the people our laws and systems are supposed to protect. The rule of law, which we have cherished since our founding, cannot abide such conduct.

We agree with the Second Circuit that official framing of a person in these circumstances undermines the right to a fair trial.[137] Being framed and falsely charged brings inevitable damage to the person's reputation, especially where, as here, the crime is a felony involving the threat of violence.[138] Alongside the reputational damage,[139] it requires the person framed to mount a defense,[140] and places him in the power of a court of law, where he may be required to appear.[141] Though these wrongs may be addressed through a Fourth Amendment challenge in many cases,[142] they do not disappear where there is no violation of that amendment. Instead, where there is no more specific constitutional protection available, the Fourteenth Amendment may offer protection.[143] It does so here, where the conduct is

---

[136] *Halsey*, 750 F.3d at 292-93.

[137] *Ricciuti*, 124 F.3d at 130; *see also Boyd*, 579 F.3d at 515 (noting that the right to a fair trial is undermined by state fabrication of evidence even when defendant is acquitted).

[138] *See Albright*, 510 U.S. at 278 (opinion of Ginsburg, J.) (discussing the consequences of being charged with a serious offense); *id.* at 289 (opinion of Souter, J.).

[139] *See id.* at 296 n.9 (Stevens, J., dissenting) (noting that *Paul v. Davis*, 424 U.S. 693, 701 (1976), "recognized that liberty is infringed by governmental conduct that injures reputation in conjunction with other interests" and that "commencement of a criminal prosecution is certainly such conduct").

[140] The Coles allege that they incurred "substantial legal fees and expenses for an attorney to defend Ryan Cole and to subsequently obtain the dismissal of the" aggravated assault on a public servant charge.

[141] *See Albright*, 510 U.S. at 278 (opinion of Ginsburg, J.); *id.* at 289 (opinion of Souter, J.).

[142] *See id.* at 274 (plurality); *id.* at 276-77 (opinion of Ginsburg, J.); *id.* at 288-91 (opinion of Souter, J.) (noting the "rule of reserving due process for otherwise homeless substantial claims").

[143] *See id.* at 273 (plurality) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior,

No. 14-10228 c/w No. 15-10045

undoubtedly shocking to the conscience and no conceivable state interest justifies the deprivations imposed.[144]

The Fourteenth Amendment forbids what allegedly happened to Ryan Cole. Where police intentionally fabricate evidence and successfully get someone falsely charged with a felony as cover for their colleagues' actions, and the Fourth Amendment is unavailing, there may be a due process violation.[145]

4.

Having found that the Coles have alleged a due process violation, we must also decide whether the violation was clearly established in October 2010. As the Supreme Court has explained, "the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right."[146] That is not the test, as it would "convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability."[147] On the other hand, officials may be on notice that their conduct is unlawful even in "novel factual circumstances,"[148] though the courts have

---

'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'") (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see also Soldal v. Cook Cty.*, 506 U.S. 56, 70 (1992) ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands.").

[144] *See Moran*, 296 F.3d at 643, 647-48.

[145] We also note that the district court in this case ruled that the Coles cannot seek a state law malicious prosecution remedy, and Officer Carson has not challenged that finding. *See Albright*, 510 U.S. at 283-84 (opinion of Kennedy, J.) (discussing the significance of adequate state post-deprivation remedies).

[146] *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

[147] *Id.*

[148] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

not had occasion to rule on "'materially similar' conduct."[149] Indeed, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question."[150]

By 2010, no "reasonable law enforcement officer would have thought it permissible to frame somebody for a crime he or she did not commit."[151] Though the First Circuit was addressing official framing that led to conviction, and the state of the law in 1967, the principle applies with obvious clarity here. "To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false [evidence] at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice."[152] "[T]he wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious,"[153] that in light of our due process violation holdings in *Castellano* and *Boyd* and the decisions of our sister circuits,[154] a reasonable officer in Officer Carson's shoes would have known his conduct violated the Constitution. "[N]o reasonably competent police officer could believe otherwise."[155]

5.

---

[149] *Id.* at 753 (Thomas, J., dissenting); *see also Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377-78 (2009).

[150] *Hope*, 536 U.S. at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) ("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." (citation omitted)).

[151] *Limone*, 372 F.3d at 50.

[152] *Ricciuti*, 124 F.3d at 130.

[153] *Devereaux*, 263 F.3d at 1075.

[154] To reiterate, the Second, Eighth, Ninth, and Tenth Circuits have found due process violations in similar circumstances. The D.C., First, Third, Sixth, and Eleventh Circuits have not answered the question, though some have spoken in broad terms about the right not to be framed. The Fourth and Seventh have found no due process violation in the absence of a conviction, but based on a theory (the need for conviction) we have rejected.

[155] *Ricciuti*, 124 F.3d at 130.

No. 14-10228 c/w No. 15-10045

Finally, the Coles have pled "specific conduct and actions giving rise to a constitutional violation."[156] We will not rehearse the pleadings in detail yet again. The Coles clearly allege that Officer Carson conspired with others and intentionally lied in order to cover for his colleagues, among other things telling investigators that Ryan turned and pointed his gun at the police. The Coles further allege that Officer Carson and other officers' lies led directly to the decision to charge Ryan with aggravated assault. As we have explained, that is enough for us to determine that they have pled a clearly established constitutional violation.

V

Officer Carson claims absolute immunity for all of his alleged conduct under *Rehburg v. Paulk*,[157] where the Supreme Court found that all grand jury witnesses have:

> absolute immunity from any § 1983 claim based on the witness' testimony. In addition . . . this rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution . . . In the vast majority of cases involving a claim against a grand jury witness, the witness and the prosecutor conducting the investigation engage in preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony. We decline to endorse a rule of absolute immunity that is so easily frustrated.[158]

The Court recognized that absolute immunity does not "extend[] to *all* activity that a witness conducts outside of the grand jury room. For example, we have accorded only qualified immunity to law enforcement officials who

---

[156] *Baker*, 75 F.3d at 195; *Schultea*, 47 F.3d at 1433.
[157] 132 S. Ct. 1497 (2012).
[158] *Id.* at 1506-07.

falsify affidavits and fabricate evidence concerning an unsolved crime."[159]

Under *Rehburg*, Officer Carson is immune for grand jury testimony, preparation for that testimony, and any conspiracy to falsely testify. He argues that all of his alleged conduct falls into those categories, but the First Amended Complaint goes further. The Coles allege that Officer Carson made false statements in the course of the *initial* investigation into the shooting, before a decision had been made by prosecutors to charge Ryan with aggravated assault. The FAC indicates that Carson intended these statements to influence the decision to bring charges against Ryan in the first place.

An officer who lies to investigating officers in order to try to get someone charged with a crime—before the decision to charge has been made—is not entitled to absolute testimonial immunity. The Supreme Court has held that a prosecutor is not entitled to absolute immunity when she falsifies an affidavit supporting an arrest warrant.[160] Neither is a police officer who submits an affidavit for a warrant, leading to an arrest without probable cause.[161] Nor are prosecutors absolutely immune when they act alongside police officers to "solve" an unsolved crime by shopping for an unscrupulous expert.[162] *Rehberg* confirmed that these holdings are still good law.[163] We have likewise held that "non-testimonial pretrial actions, such as the fabrication of evidence, are not within the scope of absolute immunity

---

[159] *Id.* at 1507 n.1 (citations omitted).

[160] *Kalina v. Fletcher*, 522 U.S. 118, 129, 131 (1997).

[161] *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986).

[162] *Buckley v. Fitzsimmons*, 509 U.S. 259, 275-76 (1993).

[163] *Rehberg*, 132 S.Ct. at 1507 n.1 (listing each of the preceding three cases to illustrate that "absolute immunity [does not] extend[] to *all* activity that a witness conducts outside of the grand jury room").

because they are not part of the trial."[164]

The conduct here—lying to investigators—comes closer to possibly preparing for grand jury testimony than some of the conduct in earlier cases, but the timing and purpose of the statements matter. The Supreme Court and this court have emphasized that absolute immunity for prosecutors, witnesses, and others is based on a need to protect central judicial proceedings.[165] Thus conduct that occurs during investigation to discover probable cause and before the decision to charge has been made is not generally entitled to absolute immunity.[166] Some of the false statements in this case are alleged to have been this investigation-stage type of conduct.

In these circumstances, lying to investigating officers is similar to

---

[164] *Castellano*, 352 F.3d at 958 & n.107 (citing *Buckley*, 509 U.S. at 275-76, and *Spurlock v. Satterfield*, 167 F.3d 995, 1003-04 (6th Cir. 1999), for the proposition that "[d]efendants cannot shield any pretrial investigative work with the aegis of absolute immunity merely because they later offered the fabricated evidence or testified at trial").

[165] *Briscoe v. LaHue*, 460 U.S. 325, 334-35 (1983) ("The central focus of our analysis has been the nature of the judicial proceeding itself."); *Kalina*, 522 U.S. at 125, 128 (noting that immunity covers "activities . . . intimately associated with the judicial phase of the criminal process"); *Malley*, 475 U.S. at 342-43 ("We have interpreted § 1983 to give absolute immunity to functions 'intimately associated with the *judicial* phase of the criminal process . . . .'"); *Keko v. Hingle*, 318 F.3d 639, 643 (5th Cir. 2003) ("[A]n informal, *ex parte* probable cause hearing is not the type of judicial proceeding for which a witness's testimony would require the full shield of absolute immunity. . . . We decline to extend absolute witness immunity into an arena where the Supreme Court has not found factual testimony to justify such heightened protection.").

[166] *Buckley*, 509 U.S. at 273-74 ("The prosecutors do not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings . . . . Their mission at that time was entirely investigative . . . ."); *Hoog-Watson v. Guadalupe Cty.*, 591 F.3d 431, 438 (5th Cir. 2009) (finding under functional approach, "prosecutorial immunity protects 'the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial,' but not 'the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested.'"); *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 637 (5th Cir. 2000) ("[A]lthough a prosecutor is absolutely immune when she acts . . . as an advocate for the state by initiating and pursuing prosecution, or when her conduct is 'intimately associated with the judicial phase of the criminal process,' she does not enjoy absolute immunity for her acts of investigation . . . .") (citations omitted).

falsifying a police report, which the Second Circuit recently held is not protected by testimonial immunity. The Second Circuit addressed how to apply *Rehberg* "when a § 1983 plaintiff alleges that the officer withheld and falsified evidence in addition to committing perjury before the grand jury."[167] It concluded that testimonial immunity does not bar § 1983 claims that can be made out without reference to the grand jury testimony or preparation for it.[168] As the court explained, "[t]he fact that [defendant's] grand jury testimony paralleled information he gave in other contexts [such as police reports] does not mean that [the claim] was 'based on' [the] grand jury testimony. Rather it was based on [defendant's] conduct that laid the groundwork for [the] indictment."[169] So here; the fact that some of Officer Carson's statements may have been presented to the grand jury can be excised from the complaint and the Coles still make out a case that Carson lied in order to ensure charges would be brought in the first place.

A final wrinkle must be addressed. While we have said that plaintiffs must plead with specificity when absolute immunity is asserted, just as with qualified immunity,[170] the Supreme Court has held that "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."[171] Officials bear the "burden of

---

[167] *Coggins v. Buonora*, 776 F.3d 108, 112 (2d Cir. 2015).

[168] *Id.* at 113 & n.7.

[169] *Id.* at 113.

[170] *Truvia v. Julien*, 187 F. App'x 346, 348 (5th Cir. 2006); *Elliott v. Perez*, 751 F.2d 1472, 1482 (5th Cir. 1985) *abrogated on other grounds by Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).

[171] *Burns v. Reed*, 500 U.S. 478, 486-87 (1991) ("The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. We have been 'quite sparing' in our recognition of absolute immunity, and have refused to extend it any 'further than its justification would warrant.'") (citation omitted); *Buckley*, 509 U.S. at 269 (quoting *Burns*); *Antoine v. Byers & Anderson, Inc.*, 508

establishing that they were functioning" in an absolutely immune role.[172] The Court's statements emphasize its reluctance to take absolute immunity too far, and contemplate the need for defendants to take an active role in claiming it.[173] Following these cases and our own precedent, we have held at the *summary judgment* stage that the burden stays with the defendant to establish his entitlement to absolute immunity.[174]

We need not decide whether a heightened pleading requirement applies at the motion to dismiss stage. We have already explained that the Coles pled "specific conduct and actions giving rise to a constitutional violation" insofar as they allege that Officer Carson fabricated evidence to get Ryan falsely

---

U.S. 429, 432 (1993) ("The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity.").

[172] *Buckley*, 509 U.S. at 274 ("The question, then, is whether the prosecutors have carried their burden of establishing that they were functioning as 'advocates' . . . .").

This goes for cases before the Court on motions to dismiss, summary judgment, and directed verdict. *See id.* at 264 (motion to dismiss); *Burns*, 500 U.S. at 483 (directed verdict); *Antoine*, 508 U.S. at 431 (summary judgment).

[173] *Antoine*, 508 U.S. at 432 n.4 ("We have consistently 'emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. We have been quite sparing in our recognition of absolute immunity . . . .'"); *Buckley*, 509 U.S. at 274 ("The question, then, is whether the prosecutors have carried their burden of establishing that they were functioning as 'advocates' . . . ."); *Malley*, 475 U.S. at 339-341 (noting that "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."); *see also Lampton v. Diaz*, 639 F.3d 223, 228 (5th Cir. 2011) (noting failure of proponent of immunity to point to a case extending it to his situation).

[174] *Hoog-Watson*, 591 F.3d at 437 n.6 ("For summary judgment purposes, *Buckley*[, 509 U.S. 259], and *Hart v. O'Brien,* 127 F.3d 424 (5th Cir. 1997) . . . hold that the defendant who pleads the affirmative defense of absolute prosecutorial immunity bears the burden of proving that the conduct at issue served a prosecutorial function . . . . In contrast, more recent Fifth Circuit decisions hold that after the defendant pleads the defense of prosecutorial immunity, the *plaintiff* bears the burden of introducing evidence sufficient to convince a reasonable factfinder that the defendant acted outside the scope of the immunity. *Cousin v. Small*, 325 F.3d 627, 632-33 (5th Cir. 2003); *Beck*[, 204 F.3d at 633-64]. But because *Hart* came before *Cousin* and *Beck, Hart* controls.").

charged. The Coles alleged that Officer Carson lied to investigating officers, telling them that Ryan turned around and pointed his gun at Officer Hunter prior to his being shot, and that Officer Hunter gave a warning before firing. They make it clear that some of these statements were made prior to the decision to charge, were intended to influence, and did influence that decision. Their pleadings are specific enough to meet any heightened pleading requirement.

---------------------------

We DISMISS the appeal by Officers Hunter and Cassidy for lack of jurisdiction. We AFFIRM the denial of Officer Carson's motion to dismiss insofar as it relates to the Coles' due process claim based on fabricated evidence and REVERSE the denial as to the Fourth Amendment and *Brady* claims. We REMAND for further proceedings.