# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
October 16, 2019

Lyle W. Cayce
Clerk

No. 17-11242

ANDERSON JONES,

> Plaintiff - Appellant

v.

ELENA PEREZ,

> Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:16-CV-2835

Before DAVIS, COSTA, and OLDHAM, Circuit Judges.

PER CURIAM:*

Dallas Police Detective Elena Perez obtained a warrant to arrest Anderson Jones for murder. In seeking the warrant, Perez did not inform the magistrate about significant problems with the reliability of the eyewitness who had identified Jones. After the charge was dropped based on those reliability doubts, Jones sued Perez. We must determine whether the arrest violated Jones's Fourth Amendment rights.

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-11242

I.

Leonardo Ortega was closing up the Subway sandwich shop where he worked when two men entered with their faces covered. One aimed a gun at Ortega while the other took cash from the register. After a struggle, Ortega was shot. He was pronounced dead when he arrived at the hospital.

Detective Perez was assigned to the case. Two eyewitnesses told her about a third man involved in the murder—a lookout who stood across from the shop and ran off with the other suspects. Perez's investigation stalled until an anonymous tipster called with information about the third suspect's identity. According to the tipster, Christopher Miller was bragging about being the lookout. Perez brought him in for questioning.

It soon became clear that Miller might not be the most reliable of witnesses. It appeared to Perez that he had "a low IQ," and Miller explained that he had smoked synthetic marijuana and drunk a few beers before coming to the station. Miller initially said he had nothing to do with the murder but soon began to waffle. He admitted—occasionally backtracking—that he was there that night. He told Perez that two men he often saw selling drugs at an apartment complex near the murder scene had asked him to watch while they robbed the Subway. Miller knew them only by their nicknames: K.T. and Weezy. It was K.T., he said, who pulled the trigger. Miller's description of the murder was consistent with what three witnesses had said the night of the crime. He left the police station that night.

The next morning, a few officers took Miller and his brother to the apartment complex to see if they could find K.T. It is unclear who ultimately made the identification, but the officers soon learned that K.T. was Anderson Jones, the plaintiff in this case. A few officers took Miller back to meet again with Detective Perez while a few others tailed Jones.

No. 17-11242

Those officers say Jones committed a Texas Transportation Code violation when he walked in the street instead of using a sidewalk. So when Jones got in a friend's car, the officers pulled him over. The officers could smell marijuana during the stop, and a search of Jones's backpack uncovered some, along with a scale and some baggies. They arrested Jones for marijuana possession and brought him in.

While detained, Jones admitted that his nickname was K.T. but denied any involvement in Ortega's murder. He said he was with his girlfriend throughout that evening. But when Perez contacted Jones's supposed alibi, she told a different story. She said she picked Jones up that night from a bus stop near the Subway. Jones was jailed on the drug charge.

Perez returned to questioning Miller. He was obviously distressed and threatened to commit suicide several times. He even attempted to strangle himself with his own shirt and had to be restrained. But he eventually repeated the story he had told Perez the previous night, albeit with some difficulty and with the aid of a few prompts from Perez. Perez decided that she should conduct a photo lineup to see if Miller could identify Jones as K.T. Another D.P.D. officer showed Miller six photographs, one at a time, and asked whether the person pictured killed Ortega. Miller answered "yes" to three of the photographs—one of Jones and two of uninvolved individuals. He explained that he thought the three he picked out all looked like the same person. Perez returned with a single photo of Jones and asked "Who's that?" Miller answered, "That's K.T."

Over the course of the two interviews, a number of inconsistencies appeared in Miller's story. He first said he was by the sidewalk directly in front of a store adjacent to the murder scene. But after Perez informed Miller that video evidence contradicted him, he said he was in the parking lot by a tree. Though he ultimately told Perez that K.T. and Weezy fled on foot, he

3

initially claimed that they drove away from the scene. At one point he even suggested his mother was at the scene of the crime. And some of his statements were contradicted by other evidence. He recalled that K.T. and Weezy were wearing t-shirts, while the official incident report explains that the suspects were wearing black hoodies. He said K.T. and Weezy dragged Ortega out of the store and shot him there, but the evidence suggests they shot Ortega inside the store. He said the murder weapon was a 9mm pistol, when it was a revolver.

Despite these inconsistencies, Perez used Miller's statements to obtain an arrest warrant against Jones for capital murder. In her probable cause affidavit, Perez explained that Miller had confessed to participating in and planning the offense, that Miller stated that "Jones shot and killed" Ortega, and that Miller "picked . . . Jones from a photo line up as the person with the gun[] who planned and participated in the offense." She also said that she had interviewed Jones and that he was "uncooperative." The warrant was issued and Jones, already detained the day before on the marijuana charge, was booked on the murder charge. His bail was set at $1,000,000.

Several days later, a few of Perez's superiors learned about her handling of the case. They were particularly concerned that Miller had selected three of the six photos he was shown in the initial lineup and that Perez had corroborated that lineup by showing Miller a single photo of Jones. After reviewing her interviews of Miller, they recommended that the capital murder charge be dropped. It was. Four days later, Jones was released from jail on a personal recognizance bond for his marijuana charge.

The Dallas Police Department investigated Perez's handling of the case. It determined that she had improperly conducted a one-photograph lineup and that she had "entered inaccurate and incomplete information" in her probable cause affidavit. The Deputy Chief testified that a lineup in which the

informant selects half of the pictures is "basically null and void." Ultimately, Perez was suspended from the force for ten days and removed from the homicide division.

Jones then filed this suit against Perez, alleging that his Fourth and Fourteenth Amendment rights were violated when he was arrested for capital murder. Perez claimed that, even if Jones's rights had been violated, she was entitled to qualified immunity. The district court determined that Jones had not suffered a violation of his constitutional rights and granted Perez summary judgment.

## II.

This court reviews a "district court's grant of summary judgment de novo, applying the same standard as the trial court." *Brewer v. Hayne*, 860 F.3d 819, 822 (5th Cir. 2017). The two-step qualified immunity inquiry is familiar: First we determine whether the facts, taken in the light most favorable to the plaintiff establish a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We then ask whether the defendant's actions were nonetheless reasonable in light of the clearly established law at the time of her conduct. *Pearson v. Callahan*, 555 U.S. 223, 243–44 (2009). Once the defense is asserted, it is the plaintiff's burden to show that the defendant is not entitled to it. *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007).

## A.

On his Fourth Amendment claim, Jones argues that by glossing over the dubious nature of Miller's identification of Jones in her probable cause affidavit and by failing to alert the magistrate that Miller's reliability was seriously in doubt, Perez violated his Fourth Amendment rights when she arrested him for capital murder. The parties agree that the typical analysis in these circumstances would require Jones to show genuine issues of material fact on 1) whether Perez knowingly, or with reckless disregard for the truth, provided

the magistrate with false information; and 2) whether after reconstructing Perez's probable cause affidavit by excising the falsehoods and inserting the material omissions, the warrant would be unsupported by probable cause.  In other words, did Perez lie to the magistrate and, if so, were those lies necessary to obtain the warrant?

That test is taken from *Franks v. Delaware*, 438 U.S. 154 (1978).  Although that case announced a standard for determining when evidence should be suppressed because it was uncovered during the execution of a search warrant obtained by misleading the magistrate, it has been applied outside the suppression and search warrant contexts to cases like this one.  *See Freeman v. Cty. of Bexar*, 210 F.3d 550, 553 (5th Cir. 2000).  The district court thus dutifully marched through the *Franks* inquiry.  It agreed with Jones that Perez's probable cause affidavit was problematic and assumed that certain facts she omitted should have been included.  Step one done, the court set out to determine whether Perez's misleading statements were necessary to get the arrest warrant.  As *Franks* instructs, the court reconstructed the affidavit to contain six material facts: 1) Perez received a tip suggesting Miller's involvement; 2) Miller confessed to planning and participating in the offense; 3) Miller said "K.T." shot Ortega; 4) Miller has a low I.Q. and had a beer and smoked synthetic marijuana prior to his initial interview; 5) "Miller's account of the crime was inconsistent and, at times, inaccurate"; and 6) Miller picked three photos, including Jones's, out of a six-photo lineup as the person who shot and killed Ortega, and later identified Jones in a single-photo lineup.  The district court then concluded that this was enough to create probable cause.

But this whole process is a bit academic when *Franks* is applied to civil cases.  Because "a warrant is not a prerequisite to a lawful arrest," the ultimate inquiry for a Fourth Amendment false arrest claim is whether the arrest was reasonable.  *United States v. Morris*, 477 F.2d 657, 663 (5th Cir. 1973); *see also*

*Graves v. Mahoning Cty.*, 821 F.3d 772, 775 (6th Cir. 2016) ("To establish a cognizable Fourth Amendment claim, the plaintiff[] must show a violation not of the *Warrant Clause* but of the *Reasonableness Clause.*").  And an arrest is reasonable when "there is probable cause to believe that a criminal offense has been or is being committed," warrant or no warrant.  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  That is why our court has, in civil suits challenging arrests,[1] applied a third step after completing the traditional *Franks* analysis. It asks whether "any reasonably competent officer possessing the information each officer had at the time [s]he swore [her] affidavit could have concluded that a warrant should issue."  *Freeman*, 210 F.3d at 553.  This inquiry is the ultimate liability question in a false arrest case: Did the officer have information establishing probable cause, whether or not that information was included in the warrant?

So whether the district court properly reconstructed the affidavit or correctly determined that the reconstruction supported a finding of probable cause is beside the point if Perez, at the time she swore out her affidavit, had probable cause to believe Jones had committed the murder.  She did.  Perez knew that Miller, who said he had witnessed the murder, pointed the finger at someone named K.T.  Other witnesses corroborated some of the information he provided about how the murder occurred.  And Jones admitted his nickname was K.T., which reduced the importance of the photo identification and put the focus on whether Miller reliably identified K.T. as the murderer.  Perez also knew that Jones gave a false alibi.  In addition to showing that Jones had been

---

[1] Civil *"Franks"* cases involving search warrants are different and remain focused on the warrant because the Supreme Court has read the Fourth Amendment to require a warrant for many searches.  The Constitution does not require a warrant for an arrest.  *See, e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001).

dishonest about where he was on the night of the murder, his girlfriend statement's placed Jones near the crime scene.

These facts are enough to clear the probable cause bar. That standard does not require that the officer believe that it is more likely than not that the suspect committed the offense. *See United States v. Watson*, 273 F.3d 599, 602 (5th Cir. 2001). Instead, the officer must reasonably believe there was a "fair probability" he did. *Piazza v. Mayne*, 217 F.3d 239, 246 (5th Cir. 2000) (per curiam) (quotation omitted). That fair probability of criminal conduct usually exists just from the statement of a single eyewitness, assuming no reliability concerns.[2]   *See Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012) ("Identification by a single eyewitness who lacks an apparent grudge against the accused person supplies probable cause for arrest."); *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity[.]" (citation omitted)). The numerous problems with Miller's statement may well have reduced its reliability below the probable cause threshold, though that is a close call as the district judge believed it was still sufficient to establish probable cause. But then there is the false alibi and Jones's girlfriend's placing him near the crime. A false alibi is, of course, quite suspicious. *See House v. Bell*, 547 U.S. 518, 551 (2006). This other evidence at least partially corroborated Miller's statement and put the overall evidentiary mix back at the level of probable cause even if the information in a reconstructed affidavit would not have sufficed.

---

[2] A separate body of law governs the probable cause inquiry when information comes from a confidential informant. *See Illinois v. Gates*, 462 U.S. 213, 238–39 (1983).

No. 17-11242

Because Perez could have reasonably believed probable cause existed when she obtained the warrant for Jones's arrest, that arrest did not violate his Fourth Amendment rights.[3]

B.

Jones also argues that the arrest violated his right to substantive due process. But the Supreme Court has warned that there is no right under the Fourteenth Amendment "to be free from criminal prosecution except upon probable cause." *Albright v. Oliver*, 510 U.S. 266, 268 (1994). Even supposing that *Albright* might not have eliminated all due process protection against an officer's allegedly unconstitutional conduct, the situations in which the Fourteenth Amendment could conceivably provide an avenue to relief would be limited. *See Cole v. Carson*, 802 F.3d 752, 771–72 (5th Cir. 2015), *vacated on other grounds sub nom. Hunter v. Cole*, 137 S. Ct. 497 (2016); *see also Manuel v. City of Joliet*, 137 S. Ct. 911, 917–18, 920 n.8 (2017). This case does not fall in that narrow class. There is no evidence, for instance, that Perez deliberately framed Jones. As we noted above, Perez reasonably believed probable cause existed to charge him with Ortega's murder. Perez may have presented the evidence against Jones in far too rosy a light, but she did not make it up out of whole cloth such that her attempt to obtain the warrant would "shock the conscience." *Cole*, 802 F.3d at 771.

---

[3] As an alternative ground for summary judgment, Perez argues that the murder warrant and arrest did not cause Jones any injury because he was already detained on the drug charge. Jones does not challenge the validity of the first arrest and he remained in jail on the drug charge for a brief time after the murder charge was dropped. Jones's response to this in the district was to point out that the murder charge resulted in a bond of $1 million, though he did not produce evidence about what the bond would have been just for the drug charge (the record does indicate that Jones was ultimately released on a personal recognize bond). Because we find Perez had probable cause for the second arrest, we need not address this alternative argument.

No. 17-11242

Because the Fourth Amendment, although ultimately unavailing, "provides an explicit textual source of constitutional protection" for the allegations in this case, Jones may not resort to the more nebulous Fourteenth Amendment right. *Graham v. Connor*, 490 U.S. 386, 395 (1989). His claim based on that amendment also fails.

\* \* \*

The outcome of this civil suit may seem inconsistent with the deterrence rationale of *Franks*. *See Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980) ("The conduct sought to be deterred in *Franks* is the knowing, intentional, or reckless use by law enforcement personnel of false statements in affidavits tendered in support of search warrants."). But it is a product of a false arrest claim ultimately being about whether probable cause existed rather than the validity of a warrant. And this case also shows that civil litigation is not the only way to hold officers accountable for misconduct. Police departments can play a role too, as Dallas's did in suspending Perez and removing her from homicide investigations based on her conduct in obtaining the warrant charging Jones with murder.

The judgment is AFFIRMED.